UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

**DEBORAH AHO SMITH,**

      **Plaintiff,**

**v.**                                        **Case No. _____**

**SCHOOL BOARD OF THE CITY OF
VIRGINIA BEACH, VIRGINIA,**

      **Defendant.**

## COMPLAINT

Deborah Aho Smith, by counsel, files this Complaint and demands judgment against the School Board of the City of Virginia Beach, Virginia on the following grounds and in the following amounts:

### INTRODUCTION

1.  This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), for unlawful discrimination on the basis of race, White, and for breach of Plaintiff's employment contract with Defendant.

### PARTIES

2.  Deborah Aho Smith ("Plaintiff" or "Smith") is an individual residing in the City of Virginia Beach, Virginia.

3.  The School Board of the City Of Virginia Beach, Virginia ("Defendant" or "VBCPS") is a body corporate organized and existing pursuant to Section 22.1-71 of the Code of Virginia, as amended, operating, under the name "Virginia Beach City Public Schools," the

public school division established pursuant to Title 22.1 of the Code of Virginia for the City of Virginia Beach, Virginia.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 2000e-5 (Title VII of the Civil Rights Act of 1964), and 42 U.S.C. § 1981 (Civil Rights Act of 1866).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims asserted here occurred in the Eastern District of Virginia.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      On or about March 18, 2019, Plaintiff filed charge of discrimination number 437-2019-00676 (**Exhibit 1**) ("EEOC Charge") with the United States Equal Employment Opportunity Commission ("EEOC"), and Defendant received a copy of it a short time thereafter.

7.      On or about June 13, 2019, the EEOC issued to Plaintiff a Notice of Right to Sue on the EEOC charge (**Exhibit 2**).

8.      This action was filed within 90 days of Plaintiff's receipt of the aforementioned Notice of Right to Sue.

9.      Plaintiff has satisfied all procedural prerequisites for the filing of this action.

### FACTS

10.     The race of Smith is White.

11.     Smith began employment with Defendant as an English teacher in September 2013 as a long-term substitute teacher at Bayside Middle School teaching 6th grade English then 8th grade English throughout the 2013-2014 and 2014-2015 school years.

2

12. Smith was then employed by Defendant as an English teacher at First Colonial High School under a written contract with Defendant which ran from January 26, 2015 through June 19, 2015.

13. Smith's employment by Defendant as an instructor continued under a written contract which ran from June 16, 2015 through July 7, 2015 (summer school).

14. Smith's employment by Defendant as an English teacher continued at Bayside Middle School under a written contract which ran from September 1, 2015 through June 20, 2016.

15. Effective January 4, 2016 Smith accepted a position as an English teacher at Kempsville High School, and was employed by Defendant under a written contract for the 2015 - 2016 school year.

16. Smith's employment by Defendant as an instructor continued under a written contract which ran from June 27, 2016 through August 16, 2016 (summer school).

17. Smith's employment by Defendant as an English teacher at Kempsville High School continued under a written contract for the 2016 - 2017 school year, commencing August 29, 2016.

18. Smith's employment by Defendant as an English teacher Kempsville High School continued under a written contract for the 2017-2018 school year, commencing June 12, 2017.

19. Throughout Smith's employment with Defendant, Smith met or exceeded the legitimate job performance expectations of Defendant.

20. At the time of Smith's dismissal described below, Smith was fifty eight years of age.

3

21. Smith reasonably expected to work as an English teacher for Defendant, and but for her dismissal described below would have worked as an English teacher for Defendant, until retirement at age sixty five.

22. English teachers at Kempsville High School sometime have incorporated the graphic novel "American Born Chinese" by Gene Luen Yang into the curriculum of 10th grade English classes, and at all relevant times the use of American Born Chinese as part of the 10th grade English curriculum was accepted by Defendant to teach students that diversity is desirable and that stereotypes and discrimination, including stereotypes and discrimination based of race, are not.

23. During the 2018 Spring semester, Ms. Tara Jones ("Jones") was an English teacher at Kempsville High School, and was the team leader of the team of English teachers at Kempsville High School of which Smith was a member.

24. During the 2018 Spring semester, Smith and Jones used American Born Chinese in their 10th grade English classes.

25. During the 2018 Spring semester, Jones downloaded from the internet a lesson plan for use with American Born Chinese, provided it to Smith, and both Jones and Smith used that lesson plan in teaching American Born Chinese to their 10th grade English classes in May 2018.

26. In order for lessons using American Born Chinese to be effective, it is necessary for students to understand the meaning of stereotypes; therefore, Kempsville High School teachers using American Born Chinese in the 10th grade English curriculum begin with a discussion with students about stereotypes, to ensure students understand the concept and to

4

teach the concept to students who do not, and learning activities to facilitate that understanding. That discussion and those activities are referred to herein as the "Stereotype Lesson."

27.     There are a number of ways Kempsville High School English Teachers have taught the Stereotype Lesson.

28.     One way Kempsville High School English Teachers have taught the Stereotype Lesson utilizes a "gallery walk." The teacher and students first identify various racial, ethnic, and social groups which sometimes have been the subject of stereotypes, including, for example, Blacks, Asians, jocks, cheerleaders, and "courtyard kids." The name of each group is then written at the top of a large poster (sometime a large Post-It note is used), and the posters are placed on tables in the classroom. The students then divide into groups, with the same number of groups as posters, and each group gathers at a poster and writes applicable stereotypes on the poster. After a short time the groups circulate to the next poster, and write applicable stereotypes on it. That continues until each group has had a turn at each poster. The class is then seated, and the teacher leads a discussion with the students about why the stereotypes written on the posters are wrong, and why stereotypes are wrong generally. This method was used by Kempsville High School English teacher Stephanie Watson ("Watson"), whose race is Black, in her 2018 Spring semester 10th grade English classes.

29.     Another way Kempsville High School English teachers have taught the Stereotype Lesson is to use pieces of paper instead of posters. Under this method, each group of students take a turn writing stereotypes on each paper until all the groups have done so, and the stereotypes are then discussed. This method differs from the gallery walk only in that it uses pieces of paper instead of posters. This method was used by Jones in her 2018 Spring semester 10th grade English classes.

30.     Both of these ways of teaching the Stereotype Lesson, as well as possibly other ways, have been accepted by Defendant.

31.     Smith conducted the Stereotype Lesson in one of her two 10th grade English classes on May 15, 2018, and conducted the Stereotype Lesson in the other of her two 10th grade English classes on May 16, 2018.

32.     Smith conducted the Stereotype Lesson using the gallery walk method.

33.     The lesson with a discussion to identify stereotype groups, and the stereotype groups selected were Blacks, Latinos, Asians, Courtyard Kids, and Jocks.

34.     The name of each stereotype group was written on a large Post-It note, and each Post-It Note was placed on the wall of the classroom.

35.     One of the Post-It notes was for stereotypes regarding Blacks, and the word "Blacks" was written at the top of it.

36.     The student groups then took turns writing stereotypes on each Post-It note.

37.     The students who wrote on the "Blacks" Post-It note were primarily Black, and they wrote on it profusely.

38.     Many of the stereotypes the Black students wrote on the "Blacks" Post-It note were words and phrases that are unacceptable for use outside of an academic discussion of racial stereotypes, and they included some racial slurs.

39.     The Black students who wrote the offensive items on the "Blacks" Post-It note appeared to find their writings humorous or amusing.

40.     None of the students who were present during the Stereotype Lesson were offended by it.

6

41.     A discussion with the students ensued, guided by Plaintiff, concerning stereotypes, which focusing on the fact the stereotypes were inaccurate and inappropriate.

42.     Each student present during each of the Stereotype Lessons enjoyed the lesson and benefitted from it.

43.     One of the students ("Student 1") present during the Stereotype Lesson, whose is Black, took a photograph of the "Blacks" Post-It note using a cell phone camera and forwarded it to one or more of his friends and family, apparently believing they would find the photo amusing or interesting, but not because he found it offensive or because he believed any of the recipients would find it offensive.

44.     The photo ended up being received by another Kempsville High School student ("Student 2"), whose race is Black, and who was not present during either Stereotype Lesson.

45.     Student 2 did not know and did not care about the context or reason for the Post-It, but was angered by the words written on it.

46.     On Friday, May 18, 2018 at 11:25 AM, Student 2 posted the photo to her Facebook page, which she maintained (and continues to maintain) in public status (meaning anyone can view it), with the message: "Ok so I've been hesitant to post this but I need y'all to share share share this racist stuff at my school needs to stop and I'm going to share until it stops" and a link to the Facebook page for WAVY TV 10.

47.     Student 2's mother ("Student 2 Mother"), whose race is Black, was angered by the photo, and on Thursday, May 17, 2018, Student 2 Mother complained to staff of Defendant. Defendant's staff informed William Harris ("Harris"), who at that time was the Principal of Kempsville High School, of the complaint, and on or about the morning of Friday, May 18, 2018, Harris spoke to Student 2 Mother by phone about the photo.

7

48.     On Friday, May 18, 2018 at approximately noon, Harris informed Smith that there
had been complaints about the poster and the Stereotype Lesson. Harris spoke to Smith then and
at 1:00 PM to obtain information about the poster and the lesson. Smith provided Harris with the
lesson plan, and informed him that she had thrown the post into the trash when the lesson was
over. Smith informed Harris that she taught the Stereotype Lesson and used the posters the same
way as teacher Stephanie Watson, whose race is Black, to which Harris replied, "*Well, she can.*"
The meaning of Harris' statement in reference to Watson was that it was acceptable for Watson
to teach the Stereotype Lesson and used the posters in that manner because Watson is Black, but
the same was not true for Smith because Smith is White.

49.     On Friday, May 18, 2018 at 11:31 AM, Student 2 added to the text of the
Facebook post: "this is Kempsville High School please share I'm tired of coming to school and
having racist things said to me."

50.     Student 2 also disseminated the Facebook post using Facebook Messenger.

51.     Several people contacted WAVY, and on Friday, May 18, 2018, WAVY reporter
Brett Hall published an article online (http://www.wavy.com/meet-the-team/brett-
hall/1062682967) with the title "Parents outraged after racial slurs, stereotypes are included in
VB classroom assignment" and a copy of the photo with many of the words redacted.

52.     The WAVY article stated: "A spokesperson for the school system said
administration was made aware of the situation just Friday and is still investigating the matter.
The spokesperson went on to say the investigation includes what disciplinary action needs to be
taken." The statement by the spokesperson that the investigation includes "*what* disciplinary
action needs to be taken" rather that "*whether* disciplinary action needs to be taken"
demonstrated that Defendant pre-judged Plaintiff and had decided, without any investigation,

8

that  Smith was guilty of an offense and would be punished.  In fact, at that time, Defendant had already decided to fire Smith solely because of the complaints about the photo.

53.     Upon learning of the article, Defendant, and in particular Harris, set about conducting a perfunctory and sham investigation and preparing a written report solely for the purpose of justifying firing Smith.

54.     On Monday, May 21, 2018 at noon, Harris met with Kempsville High School English teachers Tara Jones, Claudia Ockert, Zachary Wolff, Charlotte Jenkins, and Ashley Faher, Department Liason Celia Golden, Kempsville High School Assist Principal (now Principal) Melissa George, and a Mr. Timlin.  The purported reason for the meeting was for Harris to discuss and learn about the Stereotype Lesson given by Smith and the related curriculum.  The actual reason for the meeting was to build a sham investigatory record to support dismissal of Smith.  The pretextual nature of the meeting is evident from the fact that Harris knew from May 18, 2018 conversations with Smith that Stephanie Watson taught the same Stereotype Lesson in the same manner as Smith, yet Harris did not include Watson in the meeting.

55.     On Monday, May 21, 2018, Harris spoke with Student 2.  He made no contemporaneous written record of the conversation.  He did not have Student 2 fill out and sign a "Kempsville High School Student Statement" form then, and instead waited until June 4, 2018 to do so.  At some time on or after May 24, 2018, Harris prepared a document titled "Investigation Notes," which purports to state his findings during his investigation into the complaints about the Stereotype Lesson, but which contains only three sentences describing his May 24, 2018 conversation with Student 2.  Neither the Investigation Notes about the

9

conversation with Student 2 nor the June 4, 2018 Kempsville High School Student Statement"
form written by Student 2 say anything about anyone being offended or targeted.

56.     On Monday, May 21, 2018, Harris also spoke with Student 1, according to his
Investigation Notes. He also made no contemporaneous written record of that conversation.
As with Student 2, he did not have Student 1 fill out and sign a "Kempsville High School Student
Statement" form then, and instead waited until June 4, 2018 to do so. Neither the Investigation
Notes about the conversation with Student 1 nor the June 4, 2018 Kempsville High School
Student Statement" form written by Student 1 say anything about anyone being offended or
targeted.

57.     On Monday, May 21, 2018, Harris spoke with a third student ("Student 3")
according to his Investigation Notes. He had Student 3 fill out and sign a "Kempsville High
School Student Statement" form, but it is not dated and therefore it is impossible to determine
when it was written. Neither the Investigation Notes about the conversation with Student 3 nor
the Kempsville High School Student Statement" form written by Student 3 say anything about
anyone being offended or targeted.

58.     On Wednesday, May 23, 2018, Defendant placed Plaintiff on administrative
leave, and delivered to Plaintiff a written notice (**Exhibit 3**) informing Plaintiff that she was
being placed on leave "pending an investigation into allegations made against you for creating a
learning environment where a group of students felt they were being targeted based on their
race." No student in either class, however, felt he or she was being targeted based on their race,
nor did Defendant have any evidence that they did. The statement that "students felt they were
being targeted based on their race" was a deliberate misrepresentation made for the purpose of
building a record to support dismissal of Smith.

10

59.     On May 24, 2018, Harris spoke with a student ("Student 4"), according to his Investigation Notes. He had Student 4 fill out and sign a "Kempsville High School Student Statement" form that day. Neither the Investigation Notes about the conversation with Student 4 nor the May 24, 2018 Kempsville High School Student Statement" form written by JC say anything about anyone being offended or targeted.

60.     On May 24, 2018, Harris spoke with a student ("Student 5"), according to his Investigation Notes. He had Student 5 fill out and sign a "Kempsville High School Student Statement" form on May 25, 2018. Neither the Investigation Notes about the conversation with Student 5 nor the May 25, 2018 Kempsville High School Student Statement" form written by Student 5 say anything about anyone being offended or targeted.

61.     Harris' Investigation Notes contain the following statement: "Has Stefanie Watson taught this lesson? If so, in English 9 or 10? Yes, last year with English 10, but she did not allow ethnic groups on the charts. She did have an informal conversation about ethnic groups with her students and reported that it went well." That statement was false; Watson allowed ethnic groups to be written on her Post-It Notes, just as Smith did, and Watson said nothing to Harris supporting this misrepresentation by Harris. Harris himself contradicts it elsewhere in his Investigation Notes, where he states, "Ms. Watson may have used the lesson plan. We are still investigating this claim by Ms. Smith."

62.     The preceding describes the entire "investigation" conducted by Defendant, and demonstrated that the "investigation" was entirely pretextual and intended only to create documentary support for Smith's dismissal.

63.     On June 4, 2018, Harris recommended to VBCPS Superintendent Aaron Spence ("Spence") that Defendant terminate Smith's employment, and delivered to Smith a letter of that

11

date (**Exhibit 4**). The letter contains numerous untrue statements, including statements that "numerous students complained about the discriminatory nature of the posts," that "stereotypes ... is not part of the tenth-grade curriculum," that "the lesson should have been shaped by you to insure an appropriate learning experience" but was not, that "there was a group of students in your class who were understandably offended by this lesson," that responses made by students during the Stereotype Lesson were "at the expense of other students," that Smith had demonstrated a "highly defensive, argumentative attitude," that she violated School Board policy 4-2, "Employee Conduct," and that she "adversely affected our students and the School Division."

64.     By letter dated June 8, 2018 (**Exhibit 5**), Spence notified Smith that he accepted the recommendation of Harris and that Spence intended to recommend to the School Board of the City of Virginia Beach ("School Board") that it terminate Smith's employment. The letter contains numerous untrue statements, including statements that Smith "failed to demonstrate proper judgment and professionalism;" that Smith "failed to follow the School Division's curriculum," that Smith "violated School Board policies," that "numerous students complained about the discriminatory nature of the posts," that the Stereotype Lesson "was not part of the 10th grade curriculum," that Smith "failed to protect students from discriminatory behavior," that Smith displayed a "highly defensive, argumentative attitude," and that  Smith violated Defendant's Policy 4-56 (titled "Duties and Responsibilities of Professional Teaching Staff ") (**Exhibit 6**) and Defendant's Policy 4-2 (titled "Employee Conduct") (**Exhibit 7**).

65.     Smith filed a grievance challenging Spence's recommendation.

66.     A hearing on Smith's grievance was conducted on June 26, 2018, at which Defendant was represented by an attorney and Smith attempted to represent herself *pro se*.

12

67.     Smith had no experience in grievance proceedings, and as a result her representation of herself at the June 26, 2018 hearing was utterly ineffective. For example, Smith failed to introduce any evidence that she conducted the Stereotype Lesson in a manner virtually identical to the Stereotype Lesson conducted by English teacher Stephanie Watson, and Defendant, for obvious reasons, failed to inform the hearing officer of that. Likewise, Smith failed to call as witnesses any of her students who had been present in her class during the Stereotype Lesson, to confirm that no one in the class was offended by the lesson. Smith, in fact, called no witnesses of her own, and floundered when attempting to cross examine the witnesses called by Defendant.

68.     On July 10, 2018, the hearing officer issued his written decision on the grievance, in which he found there was sufficient evidence to support Spence's recommendation, while observing that "it is reasonable to assume the Grievant could have made a stronger case had she had an attorney" and "whether the outcome would have been different we will not know."

69.     On August 14, 2018, the School Board adopted a resolution (**Exhibit 8**) terminating Smith's employment effective as of that date, stating, "that on August 14, 2018, the School Board considered the Findings of Facts and Conclusions and Recommendations of the Hearing Officer, the transcripts of the June 26, 2018 hearing and the exhibits and, based upon such consideration, it is; resolved that the School Board adopts the Findings of Facts and Conclusions and Recommendations of the Hearing Officer that the Grievant be dismissed from employment."

70.     School Board Regulation 4-3.1 (**Exhibit 9**) is the grievance procedure used by Defendant for teachers, and it states, in pertinent part: "Following a hearing by a hearing officer, the School Board may make its decision upon the record or recording of the hearing conducted

13

before the hearing officer, or the School Board may elect to conduct a further hearing to receive additional evidence by giving written notice of the time and place to the teacher and the Superintendent within ten (10) business days after the School Board receives the record or recording of the initial hearing." School Board of the City of Virginia Beach Regulation 4-3.1, Part II, Section 3.1, subsection A.7.

71.     The August 14, 2018 School Board resolution states that the School Board considered the transcript of the June 26, 2018 hearing in reaching its decision and, if it did in fact read that transcript, it was obvious to the School Board that the vast disparity in abilities between Smith and legal counsel representing the School Board made the grievance hearing an inherently unreliable means of determining whether Smith should be dismissed.

72.     Had the School Board desired to make an appropriate decision concerning Smith's employment, it would have elected to conduct a further hearing to receive additional evidence and to make additional inquiries, in accordance with its grievance procedure; the School Board, however, did not do so, because Defendant's intent was to terminate Smith's employment regardless of the evidence.

73.     As described below, Defendant breached its employment contract with Smith by dismissing her and by refusing to continue to employ her under renewed employment contracts.

74.     If Smith were Black, Defendant would not have dismissed her and refused to continue to employ her under the circumstances presented here, or if the persons complaining about the poster had not been Black, Defendant would not have terminated her employment under the circumstances presented here. Defendant terminated Plaintiff's employment because she was a White teacher who was the subject of complaints by a Black student and Black parents who were not in class at the time of the lesson, and who either did not know or did not care that

14

Smith used the poster as an effective and appropriate tool to teach her students that stereotypes
and discrimination are wrong.

75.     The actions of Defendant described herein, including but not limited to its
dismissal of Smith and its refusal to continue to employer her, occurred because Defendant's
administration and Defendant's school board consider appeasing Black individuals and the Black
community more important that protecting the rights of White employees including but not
limited to Smith.

## COUNT 1:
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

76.     The allegations set forth elsewhere in this Complaint are incorporated by
reference into this Count.

77.     Defendant, by the actions described herein, discriminated against Smith on the
basis of her race, White, in violation of Title VII.

78.     As a direct and proximate result thereof, Smith has suffered and will continue to
suffer loss of income and employee benefits, loss of employment opportunities and earning
capacity, severe and irreparable damage to her personal and professional reputation, and severe
and extreme mental anguish and emotional distress including but not limited to anger, outrage,
frustration, embarrassment, humiliation, depression, and anxiety, accompanied by symptoms
including but not necessarily limited to crying, agitation, palpitation, fatigue, sleeplessness,
nightmares, impaired  concentration, and loss of enjoyment of life, and has incurred and will
incur expenses for the care and treatment in connection therewith, and pecuniary losses including
but not limited to job and related expenses.

WHEREFORE Plaintiff demands judgment against Defendant and as relief seeks the
following:

15

a.      A declaratory judgment that Defendant violated Title VII by its actions described herein;

b.      In injunction prohibiting Defendant from discrimination against Plaintiff and similarly situated White employees on the basis of race;

c.      Reinstatement with full restoration of seniority and status which would have been attained by Plaintiff in the absence of unlawful discrimination;

d.      Back pay in an amount to be determined at trial;

e.      Front pay in an amount to be determined at trial, in the event reinstatement is not ordered;

f.      Compensatory damages in amount of $500,000 or such other amount as may be proven by the evidence at trial;

g.      Pecuniary damages in an amount to be determined at trial;

h.      In the event compensatory and pecuniary damages are not awarded, then nominal damages;

i.      Pre-judgment interest;

j.      Post-judgment interest;

k.      Plaintiff's costs and expenses incurred herein including but not limited to expert witness fees and reasonable attorney's fees; and

l.      Such other and further legal and equitable relief as the interests of justice may require.

Plaintiff demands TRIAL BY JURY on this Count.

## COUNT 2:
## RACE DISCRIMINATION IN VIOLATION OF SECTION 1981

79.     The allegations set forth elsewhere in this Complaint are incorporated by reference into this Count.

80.     Defendant, by the actions described herein, discriminated against Smith on the basis of her race, White, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

81.     As a direct and proximate result thereof, Smith has suffered and will continue to suffer loss of income and employee benefits, loss of employment opportunities and earning capacity, severe and irreparable damage to her personal and professional reputation, and severe and extreme mental anguish and emotional distress including but not limited to anger, outrage, frustration, embarrassment, humiliation, depression, and anxiety, accompanied by symptoms including but not necessarily limited to crying, agitation, palpitation, fatigue, sleeplessness, nightmares, impaired  concentration, and loss of enjoyment of life, and has incurred and will incur expenses for the care and treatment in connection therewith, and pecuniary losses including but not limited to job and related expenses.

WHEREFORE Plaintiff demands judgment against Defendant and as relief seeks the following:

a.     A declaratory judgment that Defendant violated Title VII by its actions described herein;

b.     In injunction prohibiting Defendant from discrimination against Plaintiff and similarly situated White employees on the basis of race;

c.     Reinstatement with full restoration of seniority and status which would have been attained by Plaintiff in the absence of unlawful discrimination;

17

d.      Back pay in an amount to be determined at trial;

e.      Front pay in an amount to be determined at trial, in the event reinstatement is not

ordered;

f.      Compensatory damages in amount of $500,000 or such other amount as may be

proven by the evidence at trial;

g.      Pecuniary damages in an amount to be determined at trial;

h.      In the event compensatory and pecuniary damages are not awarded, then nominal

damages;

i.      Pre-judgment interest;

j.      Post-judgment interest;

k.      Plaintiff's costs and expenses incurred herein including but not limited to expert

witness fees and reasonable attorney's fees; and

l.      Such other and further legal and equitable relief as the interests of justice may

require.

Plaintiff demands TRIAL BY JURY on this Count.

## COUNT 3:
## BREACH OF CONTRACT BY DISMISSAL

82.     The allegations set forth elsewhere in this Complaint are incorporated by
reference into this Count.

83.     Defendant maintains written policies and regulations which are incorporated into
Defendant's employment contracts with teachers it employs including including but not limited
to Smith and which are terms and conditions of the contractual relationship between Defendant
and teachers it employs including including but not limited to Smith.  In this Complaint, those
policies and regulations are referred to collectively as Defendant's "Terms" of employment.

18

84.     One such Term, which is contained in Defendant's Policy 4-2 (titled "Employee Conduct") (**Exhibit 7**), is that "disciplinary action shall be consistently and fairly applied."

85.     Defendant did not apply it its rules consistently and fairly in dismissing Smith, and thereby breached its contract with Smith by dismissing Smith.

86.     Another such Term contained in Defendant's Policy 4-2 is that disciplinary action "shall be taken only for good reason."

87.     Defendant dismissed Smith without good reason, and thereby breached its employment contract with Smith by dismissing Smith.

88.     The Code of Virginia contains certain provisions which, by law, are incorporated into Defendant's employment contracts with teachers it employs including including but not limited to Smith, and which therefore are Terms in the contractual relationship between Defendant and teachers it employs including including but not limited to Smith.

89.     One such Term appears in Section 22.1-307 of the Code of Virginia, as amended, which states teachers may be dismissed only for "incompetency, immorality, noncompliance with school laws and regulations, disability as shown by competent medical evidence when in compliance with federal law, conviction of a felony or a crime of moral turpitude, or other good and just cause."

90.     Defendant dismissed Smith in the absence of any of the grounds for dismissal required by Section 22.1-307 of the Code of Virginia, and thereby breached its contract with Smith by dismissing Smith.

91.     As a direct result of those breaches of contract, Smith has sustained and will continue to sustain damages, including but not necessarily limited to wages and benefits she would have received during the remainder of her employment contract in effect at the time of the

termination, wages and benefits she reasonable expected to receive under future renewal

employment contracts until retirement, and consequential damages.

WHEREFORE Plaintiff demands judgment against Defendant and as relief seeks the

following:

a.      Damages in the amount of $375,000 or such other amount as may be proven by

the evidence at trial.

b.      Pre-judgment interest;

c.      Post-judgment interest;

d.      Plaintiff's costs and expenses incurred herein; and

e.      Such other and further legal and equitable relief as the interests of justice may

require.

Plaintiff demands TRIAL BY JURY on this Count.

**COUNT 4:**
**BREACH OF CONTRACT BY NONRENEWAL**

92.     The allegations set forth elsewhere in this Complaint are incorporated by

reference into this Count.

93.     A Term (as defined above) of Defendant's employment of teachers, including but

not limited to Smith, which appears in Defendant's Policy 4-57.1 (titled "Licensed Personnel:

Contracts") (**Exhibit 10**), was that "written notice of non-renewal of the contract must be given

by the School Board on or before June 15" (subject to certain exceptions provided in Virginia

Code § 22.1-305 not applicable here).

94.     Failure of Defendant to provide notice of non-renewal before June 15 of the then-

current contract's school year results in the teacher's employment contract being renewed

automatically.

20

95.     Defendant failed to give notice of non-renewal to Smith by June 15, 2018.

96.     Therefore, Smith's employment contract for the 2018-2019 school year automatically renewed for the 2018-2019 school year.

97.     Defendant breached its employment contract with Smith by failing and refusing to employ Smith during the 2018-2019 school year.

98.     As a direct result of that breach of contract, Smith has sustained and will continue to sustain damages, including but not necessarily limited to wages and benefits she would have received during the renewal employment contract, wages and benefits she reasonable expected to receive under future renewal employment contracts until retirement, and consequential damages.

99.     Smith has sustained and will continue to sustain damages, including but not necessarily limited to wages and benefits she would have received during the remainder of her contract 2018-2019 school year employment contract.

WHEREFORE Plaintiff demands judgment against Defendant and as relief seeks the following:

a.     Damages in the amount of $375,000 or such other amount as may be proven by the evidence at trial.

b.     Pre-judgment interest;

c.     Post-judgment interest;

d.     Plaintiff's costs and expenses incurred herein; and

e.     Such other and further legal and equitable relief as the interests of justice may require.

Plaintiff demands TRIAL BY JURY on this Count.

**DEBORAH AHO SMITH**

By: _____

Raymond L. Hogge, Jr.
VSB No. 29445
Hogge Law
500 E. Plume Street, Suite 800
Norfolk, VA 23510
Tel: (757) 961-5400
Fax: (757) 962-5979
rayhogge@virginialaborlaw.com
Counsel for Deborah Aho Smith

Date:  September 10, 2019